The next case on the call is 5A 16 v. 523. I have a question. You've got 523 and 524, same party. Did you want to argue that at one time? No, Your Honor. I'd like to separate the arguments. Okay, we've got no problem with that. Oh, wait a minute. I'd say it again. People v. L-U-D-Y, Ludy. Ready for case? Yes, Your Honor. May it please the Court, Counselor. My name is Lawrence O'Neill and I represent Tehran Ludy in this case. This is a direct appeal following a jury trial where Mr. Ludy was found guilty of first-degree murder for the death of 5-year-old Torian Whitaker, who was the son of Mr. Ludy's girlfriend, Terea Coleman. He was also found guilty of aggravated battery of a child involving Coleman's other son, 12-year-old Zajon Fordson. This argument pertains to the appeal of the murder conviction. I have raised three issues in this appeal. In argument one, I ask this Court to reverse Mr. Ludy's murder conviction, enter judgment on conviction from voluntary manslaughter, and revamp the cause for sentencing because the evidence shows that he lacked the requisite mental knowing state for murder when he struck Torian Whitaker once in the chest. The murder charge alleges that Mr. Ludy struck Torian in the chest with a closed fist, knowing that such act created a strong probability of death or great bodily harm. The evidence failed to prove beyond a reasonable doubt that Mr. Ludy struck Torian knowing that this created a strong probability of death or great bodily harm. A person is said to have knowledge when he is consciously aware that his conduct is practically certain to cause a particular result. That's the definition of strong probability? Strong probability? Yeah. This is the definition of knowledge, Your Honor. Okay, but the knowledge of strong probability of death does count too. Correct. You hit a five-year-old with a closed fist in the middle of his chest. That's correct, Your Honor. And your argument is that that doesn't create a strong probability of great bodily harm. Correct. That's the narrow definition of strong probability. That's correct. That's correct. And the reason is that the pathologist who performed the autopsy, Dr. Nanduri, testified that the child had a small bruise on his chest the size of the tip of a thumb. There were no internal bruises. The lungs and the chest cavity were all normal. There were no fractures or muscle hemorrhage on the outside of the bruise. And thus, Dr. Nanduri concluded, because of the lack of external and internal injuries, the force applied was low speed, low velocity. Thus, this was not a big punch where a person would know that it was creating a strong probability of death or great bodily harm. Low speed, low velocity. Furthermore, Dr. Nanduri found that the cause of death was related to Torian's cardiac condition, referred to as commotio cortis. This condition affects young people under the age of 18 when the chest is not fully formed and is compressible. Dr. Nanduri explained that when the heart transitions in its cardiac cycle, it creates a window of vulnerability for a mere 1.5 milliseconds, when an impact to the chest at that precise moment may cause a person's heart to stop. Dr. Nanduri referred to this as a very rare event. According to Dr. Nanduri, this rare event occurred in this case to Torian. Thus, Dr. Nanduri concluded that Torian's cause of death was rhythmic disturbance precipitated by blunt force trauma to the chest. But she does connect the arrhythmia, if you will, to the punch. I mean, a five-year-old has a chest that's not well formed. Correct. And the heart, the distance between the chest bone and the heart is very small. Correct. And she connected that entire sequence of events to the formation of one arrhythmia's death. We all know that one arrhythmia, you're gone. That's correct. But again, the cause of death was not simply a punch to the chest. The cause of death was a rhythmic disturbance. And we're talking here about the knowledge of my client that his action would cause death or great bodily harm. And it was the combination. Was he not found guilty on count two? That's what he was found guilty of. Right. Yes. Count two was a strong probability of death or great bodily harm. Correct, correct. Which is different than an intentional. Correct, correct. It just has to be a strong probability. But he did not acknowledge that the act would cause the strong probability of death or great bodily harm. If you punch a child in the chest, even if with low impact, who's five years old, you're saying that that cannot be a strong probability of great bodily harm? Correct. Correct, Your Honor. And again, Dr. Nandori's testimony supports that. Why? Because it was not simply. . . we're going to the knowledge. The knowledge, again, of strong probability. Correct. That's what our testimony says. Correct, correct. And if it was a combination of the cardiac event, the cardiac condition, and the transition of the cardiac cycle, and the punch, there was no way of knowing for Mr. Ludi that that punch, in combination with the rhythmic disturbance, was practically certain, again, the definition, to cause death. Or great bodily harm. Let's take it away from the heart for a minute, because you're very experienced, you know, in your field. If you hit somebody in the head with your punch and it causes the contrico injury to the back of the head that then later bleeds out and you have a subdural hematoma and die, what's different about that? It's not intending to cause. . . Your Honor, that is an involuntary manslaughter situation you're talking about there. If I hit you and I intend to cause. . . you're saying if I hit you, then I can't possibly know that there's a probability, strong probability, of great bodily harm. That's correct. I cited several cases that say death is not ordinarily contemplated as a natural consequence of a single blow with a fist. To a five-year-old. To a five-year-old. But the rule holds true in this case as well. That if it was not for the cardiac disturbance, rhythmic disturbance, this child would not have died. And again, there's no way Mr. Looney would have had knowledge that this would occur because it was a combination of the punch, low speed, low velocity, and this very rare, Dr. Nenduri described it, very rare rhythmic disturbance. And there's so . . . Mr. Looney would not have committed this act knowing that it was practically certain that it would result in a strong . . . there was a strong probability of death or great bodily harm. At least according to the testimony of Dr. Nenduri, for death to occur, not only . . . we're talking generally about some compression or low-level blow to the chest. In this specific situation, it has to be at a very specific point during the cardiac cycle. That is, it must be the left ventricle of the heart. And according to her, a window of approximately 15 milliseconds just before the T-weight, whatever that means. But obviously, it's a very specific, limited window that has to be basically applied to a very specific area of the chest and not just a blow to the chest. That is correct, Your Honor. And that's the main part of our argument. This was a . . . and again, Dr. Nenduri referred to it as a very rare event. It was the result of a . . . of this 1.5 milliseconds of the heart's cardiac transition that this event possibly could have hurt. And again, we're going back to the knowledge of my client of whether this . . . his conduct would create a strong probability of death or great bodily harm. And I submit to this Court, under these circumstances, with that situation, with a very, very rare event, at a point where 1.5 milliseconds of this could only occur. And again, we're talking about my client's knowledge of whether his conduct would cause a great bodily . . . a strong probability of great bodily harm. Mr. O'Neill, does it really matter how this child died? I mean, does it . . . do we look, when we charge someone like your client with murder, do we look at whether it's a 15 tenth of a millisecond? Or do we look at your client's conduct that caused the death? Isn't the perspective that conduct . . . But, Your Honor, we're also looking whether he had knowledge that this conduct created a strong probability of death or great bodily harm. And I submit to this Court that he . . . he would not know. He did not know that this rare event, this rare cardiac event . . . He doesn't have to know. You see, I respectfully submit that he does, Your Honor, because the knowledge element of the offense. And he would not have had knowledge, practically certain, that this conduct would cause death or a strong probability of great bodily harm.  Thank you. Counsel, do you have a question? Good morning, Your Honors. Counsel. May it please the Court. My name is Valerie Osment, and I represent the people of the State of Illinois in this matter. The State of Illinois v. Tavon Moody. The defendant challenges three things on appeal. The first is the sufficiency of the evidence.  I did file a motion to reconsider the people's motion for joinder, which I should make clear, this case and the case after this. If there was one trial, then that's the issue, whether or not they should have been joined for trial. And I did file a motion to consolidate the appeals for purposes of oral argument, because the record, the exhibits were only included in this case, 16-0523. They were not included in 0524. So in my brief in 0524, I had to cite two of the exhibits that were only included in this case. So some of the things that we discussed. The common law record in this case is different than the common law record in the other case, but the reported proceedings are substantially the same. So for any confusion, I just wanted to clarify that. That motion was denied. Did we deny the motion? Yes, it was. I'm not sure why, but. So that's the second issue. And then the third issue is the defendant challenges the trial court's discretionary decision to allow the state to introduce photographic evidence of Torian's body at trial. So as to the first issue, the sufficiency of the evidence, the defendant said multiple times in his brief and reply brief that because he had struck this five-year-old child multiple times before and didn't cause him to die, that he couldn't possibly know that hitting him hard in the chest, a barely five-year-old child, because this happened on his birthday, wouldn't die. That's a ludicrous argument, Your Honors. Knowledge, a person knows or acts knowingly with knowledge when he or she is consciously aware that his or her conduct is of that nature or that those circumstances exist. Knowledge of a material fact includes awareness of the substantial probability that that fact exists. Due to its nature, knowledge is generally established by circumstantial evidence rather than by direct proof. And a defendant is presumed to intend the probable consequences of his acts. And a great disparity in size and strength between the defendant and the victim, as well as the nature of the injuries, may be considered in this context. That is People v. Rader. I'm sorry, People v. who? Rader, Your Honor. The defendant argues essentially that the fact, this should be remanded for a resentencing on the lesser charge of involuntary manslaughter. However, the record reveals on pages 151 to 211 that the jury was instructed at the defendant's request on both involuntary manslaughter and first-degree murder, yet the jury chose to return a guilty verdict on first-degree murder. And this court should not substitute its judgment for that of the trier of fact. The defendant essentially, in his oral argument, counsel argued that the state did have to prove that he knew he was going to kill him when he punched him at this exact moment in time that was necessary to cause the force that Dr. Nandori testified to. But the fact is, under statute, the state did not have to prove that the defendant, who was a fully grown man, knew that he was going to kill Torian, a young child, when the defendant punched him. Nor did the state have to prove that the defendant knew he was going to punch Torian at the exact moment necessary for the force applied to impact his chest wall. All the state had to prove was that the defendant, in punching Torian, knew that the act would create a strong probability of great bodily harm, which is exactly what happened in this case. Multiple people testified, including Dr. Nandori, about what happened. And when Dr. Nandori was asked, specifically, if she could make a determination within a reasonable degree of medical certainty as to the manner of Torian's death, she simply answered homicide. And that's on the report of proceedings, page 537. But that's, I mean, it can only report homicide, accident, or natural cause. In an autopsy, you only get three choices. Yes, Your Honor. However, she also gave testimony that all of Torian's injuries and everything that she looked at when she was performing the autopsy all led her to believe that this was a result of severe child abuse. So that's another issue that has not been talked about, is the other testimony that was allowed in about this child. Do you think that that was appropriate, to allow in testimony of how this child had been abused, if you say, when the charge was murder? I mean, why does this testimony come in? Do you have a certain person's testimony in mind, Your Honor? No, I'm just talking about the testimony you just referenced, that Dr. Nanduri testified that there was enough here to talk about child abuse. That was your language you just told me about. Yes. And I'm asking, if the charge is murder, why is that relevant to allow that testimony in? Well, because basically the defendant's case-in-chief, they were contending that he had never harmed Torian. He testified to that, and so did the mother. She testified that they had a conversation early on that the defendant told her that I'm the man in this household, I'm going to be the one to take over the disciplinary practices. He did. She said she had never hit him. She had never seen the defendant hit him, necessarily. But his recorded interview that was played for the jury at trial, he said, I'd never hit him other than when he admitted to punching him in the chest. The recorded interview that was played for the jury, I believe it was conducted by one of the police officers. Was it Koberna, perhaps? Anyway, the defendant claimed that he didn't harm Torian in this way, and that he would only make them do military-style disciplinary things whenever they misbehaved, such as doing push-ups or running up and down a hill. He completely denied ever abusing these children, so it became- No bail. I'm sorry? No bail. Right. So that's why that testimony was in. But the defendant's not challenging whether or not that was proper testimony in this case. So the state does believe that it was proven beyond a reasonable doubt that the defendant did murder this child. A great deal of discussion revolved around the disparity in size and, of course, the age of the child. Isn't that something that mitigates the defendant's conduct, and that if there was this great disparity of size, if there was indeed a striking to the point that it caused some physical damage or physical threat to the minor's well-being, there indeed would have been some evidence of injury above the belt, like there was in the child abuse that was admitted, where you had the linear marks that indicated that maybe a striking with a belt or someone. But here, the minor's chest, both of them, except for the thumbnail injury, did not show any evidence of anyone basically striking them to the point of causing any trauma that would have been visible. And you've used the term he repeatedly struck this minor in the chest. If that was true, why then, at the autopsy, when Dr. Nanduri did her examination, all she came up with was this little thumbnail injury? It would seem to me, then, that you have evidence that the defendant, because of the size disparity, laid off. You know, we talk about striking, we talk about punches, there are a lot of punches there. There's a jab, there's a right cross when you really come across it, there's a left jab. There is a man-up in the chest. All these might be classified generally as punches in the chest, but they're radically different incidents that obviously have a different reflection of injury upon the child. It would be horrible to strike a five-year-old. Not to say any kind of striking, but you see, man-up, like it's done many times, man-up. And there's a gentle hit on the chest as opposed to a full man-sized blow against this child. So we can't be, I think, too loose with these terms of striking or close fist blows. We have to be certain that we're talking about what Dr. Nanduri described it as was a low level compression or a low level blow, something so low that it really didn't cause any significant visible trauma that would have shown up on the autopsy. Your Honor, I don't believe that punching a four-year-old who just turned five on the day that this happened in the chest was a man-up sort of punch. And I will discuss exactly what Nanduri talked about. I have the exhibits here. Nanduri testified that People's Exhibit No. 94, which is this one, Nanduri indicated is the skin. May I finish discussing these? Go on, please. Thank you, Your Honor. This is the skin of Torian's thoracic wall. Nanduri had not yet entered the chest cavity, and the photo shows that the hemorrhage was noticed earlier on the front left of Torian's chest and outside of the bruise. Impact or blunt force trauma caused this hemorrhage is what she testified to. That hemorrhage was on the inside of the skin. Yes. And it was directly underneath the bruised area. Yes. And the size of that particular hemorrhage, she's got a measurement. Did she testify how big that bleeding was in the skin? People's Exhibit No. 95, which is with Olsen. Are you on 95 or 94? Both of them. They're similar. Both of them have rulers in them. This is 95. She indicated as showing the other side of the injury. Right, but that's bleeding under the skin from the bruise. Directly from impact, yes. Right. So my question is, she's got a measurement, a ruler or something. Does she testify how much bleeding there was underneath the skin? She testified that the force applied was low speed, low velocity, and that the age of the child in this specific case is important because the chest wall is not fully formed yet, so it's much more susceptible to impact. And it's compressible in children under 18. This child was barely five years old. She testified that to kill the child before supplied must directly impact the chest wall over the left ventricle and the impact has to fall in the most vulnerable period of time. But, again, the State didn't have to prove that. They just had to prove that the defendant intended to cause grave bodily harm. No, but when Justice Wharton asked you about the low speed, the size of a thumbprint, for example, on the outside of the chest, that's what's visible, right? Yes. Remember that question? Yes, Your Honor. On the inside of the chest wall, there's a lot of bleeding. And my question to you is, did Dr. Nanduri describe how big that was? All she said on the reported proceeding, pages 522 to 523, is that as she began to conduct her investigation, she observed a small bruise on the left of his chest and two areas of hemorrhage on his back. She didn't, I don't believe, discuss the amount of bleeding that are in these photos, and if she did, I don't have them in front of me. Did she ever conclusively say that the bruise that she observed, to a reasonable degree of medical certainty, was the bruise alleged to have caused the compression of the chest which resulted in the child's injury? Conclusively, did she say that? She was asked if she could make a determination within a reasonable degree of medical certainty as to the manner of the child's death, and she did indicate a homicide and as a result of severe child abuse. Did she connect the two? Did she say that this bruise here was a result of the blow that caused the death? She went into the fact that it had to be done at this exact period of time. Did she say that this bruise that she observed, did the autopsy and testify, was a result of the blow, to a reasonable degree of medical certainty, the blow that caused the death? I don't have that in front of me, Your Honor, but she did say that had first responders been made aware that Torian had been punched in the chest, that information would have been helpful to the first responders, because when they find a person in cardiac arrest, a defibrillator is used to revive the heart, so had they been told that, they could have saved their child. But she wasn't asked then, probably, at least from your recollection of the record, she wasn't asked if this thumbnail bruise and the injury that the jury heard about, and obviously made a connection, but she never was certain, or she never did make a complete, definite statement for the jury to make that jump, that this bruise was actually caused of the compression of the chest that would result in the blow of the minor or the death of the minor. If she did, I don't have that before me. However, the jury clearly took what she said and made that connection, and that that was the result of what happened, and they are the ultimate fact-finders in this situation. And I will save the remaining of my arguments for the next case, the Joinder argument. Thank you very much. Thank you, counsel. Your Honor. Your Honors, again, this case should hinge on Dr. Nanduri's testimony and findings, and Dr. Nanduri did connect two events as the cause of death. The blow to the chest occurring at this very rare event that caused a rhythm disturbance in the heart during its cardiac transition, and this had to have been at a precise moment. So that is undisputable that that was the cause of death. It was not simply the low-speed, low-velocity blow. It was a combination of that occurring at the very precise, limited window of the transition of the cardiac cycle. Moreover, Dr. Nanduri testified that there were no internal injuries to Tori. There were no internal injuries that occurred as a result of this one-time blow of low-velocity speed to the chest. Well, then what was the bleeding on the internal? Your Honor, I don't believe Dr. Nanduri elaborated on the specifics of that or whether it was even related to this incident. I know that Dr. Nanduri testified that there were no internal bruises or injuries. I can't recall specifically whether the doctor was specifically addressed that photograph there. I mean, that bruise on the photograph. Well, you've got two photographs that show the internal chest wall in the brief, and nobody knows what they're talking about. I don't believe Dr. Nanduri discussed that. I mean, he concluded, she concluded that there were no internal bruises related to this incident. What about the fact that the jury heard or was given an involuntary manslaughter instruction? Correct. And that this Court should review that decision of the jury because the evidence supports a finding of involuntary manslaughter rather than knowing murder, knowing first-degree murder. Now, this Court certainly has the authority and power and the obligation to review a jury's finding. I don't know if there's deference to the jury's finding, but this Court has to review the evidence and determine whether the State proved all the elements of the offense beyond a reasonable doubt. And here, the offense is first-degree murder or known first-degree murder, and this Court should use its authority to reverse the conviction and enter a judgment for involuntary manslaughter because that was what the evidence establishes, that Mr. Loody's conduct was not knowing murder but was performed, is that conduct was done in a reckless manner. And that this case is not a first-degree murder case. It is an involuntary manslaughter case. You're confessing that at this point? Pardon me? You're not, you are or you are not confessing involuntary manslaughter? I'm arguing that the evidence supports involuntary manslaughter, not first-degree murder. Any other questions, Your Honor? Thank you. And we have the same counsel for the next case, and the next case is?